UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ANTHONY LEVACK,

              Petitioner,

v.

DeWAYNE BURTON,

              Respondents.

_____/

Case No. 1:16-cv-125

Hon. Hala Y. Jarbou

## REPORT AND RECOMMENDATION

David Anthony Levack (sometimes referred to as "Levack" or "petitioner"), has filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. For the reasons discussed below, I recommend that the petition be granted.

### I.      Background

### A.      Trial, conviction and sentence

The Michigan Court of Appeals summarized Levack's criminal conduct as follows:

> A jury convicted [Levack] of murdering Joyce Johnson after breaking into her home outside Crystal Falls, allegedly to prevent her from testifying against him for larceny of Johnson's property. [Levack] knew Johnson — he provided home healthcare for her husband until her husband's death in November 2009, and thereafter he continued to perform handyman services for Johnson. In December 2010, Johnson reported that [Levack] had stolen some of her jewelry, and identified a ring that [Levack] had pawned. The ring was inscribed with the initials of Johnson's and her husband's first names and the date of their marriage. [Levack] was charged with the theft and the case was scheduled for trial on September 27, 2012 [sic]. When Johnson failed to appear for trial, a "well-being" check was requested. The police found Johnson's body mostly submerged in water in her bathtub, and subsequently determined that she died of manual strangulation, probably on September 26, 2011.

*People v. Levack*, No. 311630, 2014 WL 2118088 at *1 (Mich. App. May 20, 2014).

After a 10-day trial in the Iron County (41st) Circuit Court, a jury convicted Levack of: (1) first-degree murder under theories of both premeditated and felony murder, M.C.L. § 750.316(1)(a) and (b); (2) first-degree home invasion, M.C.L. § 750.110a(2); and (3) witness intimidation (involving committing or attempting to commit a crime), M.C.L. § 750.122(7)(c). *Id.* On June 11, 2012, the trial court sentenced Levack to serve a term of life in prison without possibility of parole for first degree murder, a term of 20 to 40 years for first degree home invasion, and a term of 20 to 30 years for intimidation of a witness. Sent. Trans. (June 11, 2012) (ECF No. 9-16, PageID.2747).

### B.    State court appeal

Levack, through counsel, raised the following claims on appeal:

I.    Whether [Levack's] convictions should be overturned because there was insufficient credible evidence at trial to prove [Levack] guilty of the crimes?

II.    Whether a new trial should be ordered because misconduct by the jury violated [Levack's] right to be present at trial [sic], his right to confront the witnesses against him, his right to present a defense, and his due process rights?

III.    Whether the trial court denied [Levack] a fair trial and his due process rights by denying [Levack's] motions for a mistrial and by erroneous evidentiary rulings?

IV.    Whether the prosecutor's actions denied [Levack] a fair trial and his due process rights under the Michigan and Federal Constitutions?

Appellate Brief (ECF No. 9-17, PageID.2781).

Levack also filed his own *pro se* supplemental "Standard 4 Brief" stating four additional claims.[1]  This Court has re-numbered the claims as a continuation of the issues raised in counsel's appellate brief:

---

[1] "In 2004, the state Supreme Court promulgated standards for attorneys representing indigent defendants on appeal. (Admin. Order 2004-6, 471 Mich. cii (2004)). Standard 4 allows defendants to file *pro se* appellate briefs, in addition to the brief submitted by appointed counsel." *Payne v. Washington*, No. 1:11-cv-325, 2013 WL 2520824 at *2, fn 2 (W.D. Mich. June 10, 2013).

V.      [Levack's] convictions should be overturned because the trial judge denied [him] a fair trial and his due process rights by denying [his] motions.

VI.     [Levack's] convictions should be overturned because trial judge [sic] erred in failing to dismiss jurors for cause as requested by both the prosecution and defense resulting in an unfair and biased jury.

VII.    [Levack's] convictions should be overturned because the court denied [him] the right to assist in his own trial.

VIII.   [Levack's] convictions should be overturned because [he] received such ineffective assistance of counsel that it rises to the level of needing a new trial.

Standard 4 Brief (ECF No. 9-17, PageID.2897).  The Michigan Court of Appeals affirmed the conviction and sentence.  *Levack*, No. 311630, 2014 WL 2118088.

Levack filed a *pro se* application for leave to appeal to the Michigan Supreme Court and a motion to remand, raising these eight issues along with four new issues:

IX.     [Levack] is entitled to a new trial based upon evidence which was discovered after he was convicted where that evidence is not cumulative, could not have been discovered by [him] prior to the criminal trial and would probably cause a different result on retrial.

X.      [Levack] was denied effective assistance of counsel when trial counsel failed to file a motion for a new trial after discovery of new evidence and failure to pass along the new evidence to appellate counsel in a timely manner.

XI.     [Levack] was denied effective assistance of appellate counsel when counsel failed to request a "Ginther" hearing, limiting the resources available for review of issues on appeal.

XII.    The cumulative effect of these errors denied [Levack] due process of law. V AM. US CONST.

Application for leave (ECF No. 9-18, PageID.2918-2960).

On February 3, 2015, the Michigan Supreme Court denied the application for leave to appeal "because we are not persuaded that the questions presented should be reviewed by this Court." *People v. Levack*, 497 Mich. 952; 858 N.W.2d 446 (2015).  The court also denied Levack's motion to remand.  *Id.*

Levack filed a timely petition seeking federal habeas review pursuant to 28 U.S.C. § 2254.  *See* Petition (ECF No. 1).  The petition seeks relief based upon the first eight issues which he raised in the Michigan Court of Appeals:

I.      The petitioner's convictions should be overturned because there was insufficient credible evidence at trial to prove the petitioner guilty of the crime.

II.     A new trial should be ordered because misconduct by the jury violated the petitioner's right to be present at trial, his right to confront the witnesses against him, his right to present a defense, and his due process rights.

III.    The trial court denied the petitioner a fair trial and his due process rights by denying the petitioner's motions for a mistrial and by erroneous evidentiary rulings.

IV.     The prosecutor's actions denied the petitioner a fair trial and his due process rights under the Michigan and Federal constitutions.

V.      The trial judge denied the petitioner a fair trial and his due process rights by denying petitioner's motions.

VI.     The trial judge erred in failing to dismiss jurors for cause as requested by both the prosecution and defense, resulting in an unfair and biased jury.

VII.    The Court denied the petitioner the right to assist in his own trial.

VIII.   Petitioner received such ineffective assistance of counsel that it rises to the level of needing a new trial.

Petition at PageID.8, 10-13, 15-16, 22-25.[2]

---

[2] Levack filed a 22-page habeas petition listing eight grounds for relief (ECF No. 1).  He also filed a 90-page brief in support of the petition (ECF No. 2), and a 57-page response to the attorney general's answer (ECF No. 13).  Levack's brief and response contain numerous grievances and claims related to his trial and convictions.  However, his habeas case in this Court is limited to the eight specific grounds for relief set forth in his petition.  In *Mayle v. Felix*, 545 U.S. 644, 654 (2005), the Supreme Court reminded lower courts that "[a] discrete set of Rules governs federal habeas proceedings launched by state prisoners."  The Supreme Court characterized habeas corpus proceedings "as civil in nature," *id*. at fn. 4, with the habeas petition being the "original pleading" filed in those proceedings.  *Id*. at 654-655.

## II.    Standard of review

Levack seeks relief under 28 U.S.C. §2254, which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Before a petitioner may seek such relief in federal court, he must first fairly present the substance of his federal claims to all available state courts, thereby exhausting all state remedies.  *See* 28 U.S.C. §2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971).   For purposes of this report, the Court will treat all of Levack's claims as exhausted.[3]

"Under AEDPA, a habeas petition is eligible for relief only if he shows that the state court's decision (1) was 'contrary to  .  .  .  clearly established' federal law as determined by U.S. Supreme Court precedents or (2) amounted to 'an unreasonable application' of the same.  28 U.S.C. § 2254(d)(1)."  *Woods v. Cook*, 960 F.3d 295, 300 (6th Cir. 2020).  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington v.*

---

In this regard, Rule 2(c) of the Rules Governing 2254 Cases in the United States District Courts requires that habeas petitions must: "(1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested; (4) be printed, typewritten, or legibly handwritten; and (5) be signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner under 28 U.S.C.A. § 2242."  As discussed, Levack's petition listed eight specific grounds for relief as required by Rule 2(c).  However, Levack attempted to expand those grounds by including open-ended references such as "Also see Petitioner's Brief".  *See* Petition at PageID.7, 10, 12, 15, 21.  An issue or argument raised only in Levack's 90-page supporting brief is not a specific "ground[] for relief" under Rule 2(c)(1).  Levack's reference to his supporting brief appears to be an attempt to engage in notice pleading by incorporating any matters mentioned in the brief as additional grounds for relief.  This shotgun approach is inconsistent with the specific pleading requirements of Rule 2(c).  *See Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (notice pleading is not sufficient in the habeas context).

[3] Respondent points out that Issue II, along with Issues IV, "a portion" of Issue V, and Issue VII were procedurally defaulted.  *See* Answer (ECF No. 8, PageID.174). Given the record in this case, the Court will address the merits of the issues.  *See Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011) (addressing the merits after observing that "[t]he extent to which these claims are procedurally defaulted is a nettlesome question; the extent to which they are meritless, much less so"); *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010) (addressing the merits because "the cause-and-prejudice analysis adds nothing but complexity to the case").

*Richter*, 562 U.S. 86, 101-102 (2011) (internal quotation marks omitted).  The federal habeas statute "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted).  In addressing the petitioner's habeas claims, "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to the factual findings of a state appellate court based on the state trial record.  *Brumley v. Winegard*, 269 F.3d 629 (6th Cir. 2001).

### III.    Discussion

### A.    Issue I - The petitioner's convictions should be overturned because there was insufficient credible evidence at trial to prove the petitioner guilty of the crime.

### 1.    The elements of the three crimes

Levack was convicted of three crimes: (1) first-degree murder under theories of both premeditated murder, M.C.L. § 750.316(1)(a), and felony murder M.C.L. § 750.316(1)(b); (2) first-degree home invasion, M.C.L. § 750.110a(2); and (3) witness intimidation (involving committing or attempting to commit a crime), M.C.L. § 750.122(7)(c).   The elements of these crimes are as follows.

First-Degree Murder under the theory of premeditated murder.  "The elements of first-degree murder are that the defendant killed the victim and that the killing was either 'willful, deliberate, and premeditated,' M.C.L. § 750.316(1)(a), or committed in the course of an enumerated felony, such as larceny, M.C.L. § 750.316(1)(b)." *People v. Bowman*, 254 Mich. App. 142, 151, 656 N.W.2d 835 (2002).

<u>First-Degree Murder under the theory of felony murder.</u>  The enumerated felonies to establish first-degree murder under this theory include first or second degree home invasion. *See* M.C.L. § 750.316(1)(b).[4]  As discussed, Levack was convicted of first-degree home invasion, which established first-degree murder under the theory of felony murder.

<u>Home Invasion.</u>  The applicable statute provides that:

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:
>
> (a) The person is armed with a dangerous weapon.
>
> (b) Another person is lawfully present in the dwelling.

M.C.L. § 750.110a(2).

<u>Witness intimidation.</u>  The relevant statute M.C.L. § 750.122 ("Inducements or promises to witnesses, prohibitions; threats or intimidation") provides in pertinent part as follows:

> (7) A person who violates this section is guilty of a crime as follows: . . . (c) If the violation involves committing or attempting to commit a crime or a threat to kill or injure any person or to cause property damage, the person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not more than $25,000.00, or both.

M.C.L. § 750.122(7)(c).

**2.      Overview of Levack's claim**

---

[4] "Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, *home invasion in the first or second degree*, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n,1 torture under section 85,2 aggravated stalking under section 411i,3 or unlawful imprisonment under section 349b." (emphasis added.)

Levack contends that there is no evidence connecting him to the charged crimes. Levack's appellate counsel contested the interpretation of the evidence at trial, stating that "there is insufficient credible evidence to justify the convictions" because "circumstances don't point to the Defendant as being the guilty party with 'impelling certainty' and the circumstantial evidence is just as consistent with innocence."   *See* Appellate Counsel's Brief (ECF No. 9-17, PageID.2793).[5]  In this regard, appellate counsel noted a few examples, *i.e.*, even if Levack "made a telephone call to the victim the night of the murder, this does not prove guilt beyond a reasonable doubt", and "the fact that he was out in the area the day before the murder 'birdwatching' doesn't prove guilt".  *Id*. at PageID.2794.  Appellate counsel also pointed out the lack of evidence linking Levack to the crimes, *e.g.*, Levack's DNA was not found inside of the house or on the victim, and the victim's DNA was not found on plaintiff's personal items such as gloves or clothing.  *Id*. at PageID.2795.  Appellate counsel also pointed out that key evidence in the larceny case indicated Levack's innocence, *e.g.*, the jewelry which Levack pawned was not from the victim (being 18 carat gold) but from Levack's grandmother and mother (being 14 carat gold).  *Id*. at PageID.2796.

With respect to the home invasion, there was no evidence of forced entry.  *Id*. at PageID.2802.  In this regard, Ken Walker, a Michigan State Police Detective Sergeant assigned to assist the Iron County Sheriff's Department with the murder investigation, testified that the sheriff's department had established several things that became important, *e.g.*, there was "no forced entry to the residence" and "no sign overtly of robbery."  Trial Trans. VI (April 30, 2012) (ECF No. 9-11, PageID.2142). For these reasons, "we started to look toward people that she may have known."  *Id*.  In summary, appellate counsel posited that "[a]ll of these things together are

---

[5] As discussed, Levack filed two appellate briefs. When relevant, the Court will refer to arguments and representations made by "appellate counsel" and those arguments and representations made by "Levack" in his *pro se* brief.

either circumstantial evidence showing a reasonable doubt or a lack of circumstantial evidence showing guilt."  Appellate Counsel's Brief at PageID.2793-2806.

In his memorandum filed in support of the habeas petition, Levack stated "that there was no evidence to support the underlying crime of home invasion."  Memo. (ECF No. 2, PageID.66).  In support of his claim, Levack noted that while his DNA was found on a Powerade bottle near the victim's house, that "is not proof of the crime since there was no dating of when the bottle was left there."  *Id*.

In answering the petition, respondent summarized Levack's sufficiency of the evidence claim as follows:

> Here, Levack does not dispute that Joyce was murdered or that her murder was committed with deliberation and premedication [sic].  Nor does he dispute that there was a home invasion.  Levack's theory of defense is that some other person is the killer and that there is not sufficient evidence to establish his identity as the murderer.  He asserts that without direct, eye-witness, or forensic evidence connecting him to the crime or the crime scene—and in light of his alibi for a lengthy portion of the night provided by his friend—the convictions cannot stand.  Nonsense.

Answer (ECF No. 8, PageID.201).

### 3.    The state appellate court decision

It appears to this Court that Levack disputes virtually every fact relied upon by the Michigan Court of Appeals to support the convictions.  *See* Petitioner's Memorandum (ECF No. 2, PageID.34-123); Appendix (ECF No. 2-1, PageID.124-156); "Petitioner's Response Rebuttal" with exhibits (ECF Nos. 13 and 13-1, PageID.3246-3309); Petitioner's Motion for summary judgment, brief and exhibits (ECF Nos. 20, 21 and 21-1, PageID.3330-3416), and Petitioner's Motion regarding precedent (ECF No. 24, PageID.3422-3441).  Because the Michigan Court of Appeals' decision set out the facts upon which it relied to affirm the convictions, this Court will

set forth the appellate court's entire discussion addressing Levack's claim that the evidence was insufficient to support the three convictions:

A.     SUFFICIENCY OF THE EVIDENCE

"Due process requires that the prosecutor introduce sufficient evidence which could justify a trier of fact in reasonably concluding that defendant is guilty beyond a reasonable doubt before a defendant can be convicted of a criminal offense." *People v. Hampton*, 407 Mich. 354, 368; 285 NW2d 284 (1979). The trial court denied defendant's motion for a directed verdict at the close of the prosecution's proofs. Accordingly, we "consider the evidence presented by the prosecution up to the time the motion is made . . . view that evidence in a light most favorable to the prosecution . . . and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id.* (citations omitted). "'Circumstantial evidence and reasonable inferences that arise from the evidence can constitute sufficient proof of the elements of the crime.' Minimal circumstantial evidence is sufficient to prove the defendant's state of mind." *People v. Portellos*, 298 Mich. App 431, 444; 827 NW2d 725 (2012) (footnotes omitted), quoting *People v. Akins*, 259 Mich. App 545, 554; 675 NW2d 863 (2003).

Here, defendant unconvincingly argues that the prosecution failed to present credible evidence to support his convictions. Apart from the fact that Johnson's murder occurred shortly before she was to testify against defendant in his larceny trial, the prosecution provided ample circumstantial evidence that defendant broke into her home and murdered her. The evidence falls into three broad categories: (1) defendant's location and behavior before the murder; (2) defendant's location and behavior after the murder; and (3) defendant's own statements regarding the murder.

1.  DEFENDANT'S LOCATION AND BEHAVIOR BEFORE THE MURDER

Before the murder took place, a witness testified that defendant stated he was upset with the larceny charge against him, and that he was going to take care of the situation. Other witnesses said that on September 25, 2011, they saw defendant wearing camouflage pants and holding binoculars in a secluded and wooded area on private land near the victim's home. Though defendant claimed he was bird-watching as part of a bet with a friend, the friend denied any such bet existed. Further, defendant's bird-watching story conflicted with his initial account of the days in question, in which he denied being in Iron County during the relevant time period.

On September 26, 2011, the day before defendant's scheduled larceny trial and the suspected day of the murder, defendant told others that he was going to Crystal Falls. Witnesses saw his car near the victim's house at approximately 7:30

AM. His whereabouts during that day are unclear.  Though he was supposed to play in a pool league at 7:00 PM that evening, he did not attend and told a league member that he was in Crystal Falls.

Defendant's Tracphone records provided additional evidence of his location in and around Crystal Falls (and the victim's home) on September 26, 2011, and also brought the testimony of defendant and his supportive witnesses into question. Though Lex Johnson testified that defendant was at his house from approximately 6:00 to 9:00 PM, defendant's Tracphone record indicated that defendant was mobile during this time period, moving about in the area between Iron Mountain, Florence,[FN 1] and Crystal Falls. Defendant made a number of calls, including to the victim's line, [FN 2] from 6:00 to 9:00 PM, and these calls bounced off cell-phone towers in Iron Mountain, Florence, and Crystal Falls.  In addition, defendant used his cell phone to call Lex Johnson sometime in between 6:00 and 9:00 PM, which cast doubts on Johnson's claim that defendant was at his house during this time span.  Further, another witness, Jamie Rose, stated that she saw defendant at Lex Johnson's house after 10:00 PM — not before. And Lex allowed defendant to stay at his home when the police were looking for defendant, which indicates he possessed an allegiance to or sympathy for defendant.

2.    DEFENDANT'S LOCATION AND BEHAVIOR AFTER THE MURDER

After the authorities discovered Joyce Johnson's murder, defendant was hard to locate and seemed to be avoiding the police.  Defendant again relied on Lex Johnson, and asked to stay with him on October 1, 2011.  Lex eventually told the police that defendant was at his home, and gave them permission to enter the house. When no one answered, the police opened the door, announced their presence, and yelled for defendant, who did not respond. Eventually, defendant came up from the basement and identified himself. He told police that "I believe you were here to ask me about two court dates and about that night." Defendant claimed he had been in Dickinson County the whole weekend before Johnson's death, and not in Iron County. Defendant asked to stop speaking with police, so both parties agreed that defendant would come to the State Police post at 11:00 AM on October 3, 2011. Defendant then left Johnson's house and did not stay the night. A witness testified that around this time, defendant said he was a "fugitive."

Defendant's landlord testified that defendant returned home at approximately midnight on October 2, 2011, and stayed for about 15 minutes. At about the same time, a police officer learned that defendant was loading items into a taxi, possibly with the intent to flee. Defendant went to a Motel 6 in Kingsford with Jamie Rose, who testified that she and defendant had discussed leaving town together the night before to "[g]et away from this place."  When the police arrived at the Motel 6, Rose asked defendant what was going on. She testified that defendant was livid and said something like the "bitch" was going to testify against him about stolen jewelry. Despite requests from the police, defendant refused to come out of the motel room, reiterating that he would be at the State Police post at

11

11:00 a.m. as planned. Rose testified that defendant called his mother, telling her he loved her and that if anything happened to remember that he loved her. Rose also stated defendant gave her his Bridge card, and told her would contact her later.

As he came out of the motel room, the police asked defendant to halt, which he did, with his back to the officers. Defendant then reached and turned, pointed a knife at the detectives, and then held it to his throat, and said: "Is this what you want?" He then stated he was not going to give them his life and that they would have to take it. The police drew their guns and ordered defendant to drop his knife. Though defendant sheathed the weapon for a time, when additional police officers arrived, defendant pulled out the knife again, threatened the officers, and lunged at them, stating "[y]ou're going to have to shoot me." Afterwards, defendant again sheathed the knife, but brought it out a third time and threatened the officers once more. The police then tased him. Defendant had approximately $1,000 in his wallet.

3.    DEFENDANT'S STATEMENTS

Prior to his arrest, witnesses testified that defendant made a number of incriminating statements about the victim's murder. Brian Krause stated that, around the time of the larceny trial, defendant remarked that there were "no marks left" and that "[he] can't believe [he] went back to that house again and at least there aren't any marks" "on the neck." [FN 3] In addition, a number of witnesses testified that on the morning of his scheduled larceny trial, [FN 4] defendant appeared "like a statute" [sic] when he was informed of the victim's murder.[FN 5] One witness also stated that during that afternoon, defendant laughed and said they could not find "that lady" to testify against him.

At his post-arrest police interview, defendant was inconsistent with dates and times, but admitted that he had been at the victim's home (in violation of a court order) earlier in September.  He also told police that he had been in the area of the victim's home on September 19 and 20, 2011 to bird-watch.  Apparently defendant returned to the area on September 25, but denied being on the victim's land.  Defendant's veracity on his whereabouts in and around the victim's property was called into doubt by the discovery of a Powerade bottle about 65 to 75 feet from the victim's home — an area where defendant denied being — which contained defendant's DNA.  The bottle was not discolored from moisture or sunlight, indicating it had been placed there recently.  Defendant stressed that on September 26, which he acknowledged as the alleged date of the murder, he was with Lex Johnson.

After the interview, the police took defendant to the hospital for a mental health examination. While waiting, he asked the officers why they did not shoot and kill him, and whether he would have had to throw the knife for this to occur. He also asked one officer if he had ever killed anyone, and mentioned that he believed in reincarnation.  Defendant's behavior prior to the interview was erratic and involved bouts of crying.

4.     SUMMARY

When viewed together in the light most favorable to the prosecution, the evidence is more than sufficient to sustain defendant's convictions.  Defendant had a motive to murder the victim: to keep her from testifying against him in the larceny case.  Shortly before the murder, he violated a court order and went on property near defendant's home, which supports a legitimate inference that he conducted surveillance on the victim or her house.  The Powerade bottle with defendant's DNA that was found 65 to 75 feet from the victim's house disproved defendant's claim that he was never in this area.  It also established that he was near the crime scene, and its placement on top of leaves and its lack of discoloration suggested that it was placed there around the time of the murder.  Defendant's Tracphone records indicate his movement in and around Crystal Falls on the alleged day that the victim's murder occurred.  Further, his evasion of the police, statements to Rose, and the $1,000 on his person suggest that defendant intended to flee, which could indicate his guilt.  *See People v. Unger*, 278 Mich.App 210, 226; 749 NW2d 272 (2008). And defendant's violent and unstable actions during his confrontation with the police suggest suicidal ideation, which has also been recognized as evidence of consciousness of guilt. *See Unite*[d] *States v. Cody*, 498 F3d 582, 591 (CA 6, 2007).

Moreover, defendant's own statements cast doubt on his truthfulness and innocence. His remarks to Krause regarding the absence of leaving no marks on the victim's neck were incriminating. Although Krause's own truthfulness is debatable, credibility is a question for the jury.  *People v. Harrison*, 283 Mich. App 374, 377-378; 768 NW2d 98 (2009). And defendant gave inconsistent statements on his whereabouts during the weekend before the offense, first saying he was in Dickinson County and then admitting he was near the victim's home.  Inconsistent statements can also indicate consciousness of guilt.  *Unger*, 278 Mich. App at 225-226.

In an effort to show his innocence, defendant asserts that there is no physical evidence placing him inside the victim's home at the time of the murder, and posits that there are other individuals who might have had a motive to kill the victim. However, the prosecution

> need not negate every reasonable theory consistent with innocence. *People v. Konrad*, 449 Mich. 263, 273, n 6; 536 NW2d 517 (1995). Instead, the prosecution is bound to prove the elements of the crime beyond a reasonable doubt. It is not obligated to disprove every reasonable theory consistent with innocence to discharge its responsibility; it need only convince the jury "in the face of whatever contradictory evidence the defendant may provide." [*People v. Nowack*, 462 Mich. 392, 400; 614 NW2d 78 (2000).]

In sum, when the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that defendant broke into Joyce Johnson's home and killed her to prevent her from testifying at his larceny trial. Accordingly, the evidence was sufficient and defendant was not denied due process.

[FN 1] Florence is located in Wisconsin.

[FN 2] Defendant used Star 67 to conceal his phone's number from a caller-identification system when he called the victim's number. This was the last known call to the victim's telephone.

[FN 3] Krause did not tell police this information in his initial interview. He explained that he had been on a "drug bender" and that his memory had improved since getting sober. He was in jail awaiting trial on a felony, but testified that while he initially asked for a deal in exchange for this information, he did not receive any deal. A number of Krause's friends testified that he was not always truthful.

[FN 4] September 27, 2011.

[FN 5] Defendant's attorney for the larceny case testified that he told defendant of Johnson's murder before the judge's announcement, and that he instructed defendant not to make any outward display of emotion.

*Levack*, 2014 WL 2118088 at *1-5.

### 4.    Legal standard

In *In re Winship*, 397 U.S. 358 (1970), the Supreme Court held that Fourteenth Amendment's Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364. "A defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995). Sufficient evidence supports a conviction if "after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In evaluating a sufficiency of the evidence claim, the court views both direct evidence and circumstantial evidence in the light most favorable

to the prosecution, drawing all available inferences and resolving all issues of credibility in favor of the factfinder's verdict. *United States v. Rayburn*, 495 F.3d 328, 337-38 (6th Cir. 2007). The reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution, and must defer to that resolution. *Wright v. West*, 505 U.S. 277, 296-97 (1992).

### 5.    Discussion

#### a.    Presumption of correctness

As discussed, the state appellate court's review and summary of the evidence is entitled to a presumption of correctness. *See* 8 U.S.C. § 2254(e)(1); *Brumley*, 269 F.3d 629. The Court has reviewed petitioner's memorandum, respondent's extensive recitation of the evidence (*see* Answer, ECF No. 8, PageID.201-212), and the relevant portions of the trial testimony (*see* ECF Nos. 9-7, 9-8, 9-9, 9-10, 9-11, 9-12, and 9-13). Based on this review, Levack has not rebutted the presumption as to the facts cited in the Michigan Court of Appeals opinion.

#### b.    The circumstantial evidence

The gist of Levack's claim is that no witnesses saw him commit these crimes and the circumstantial evidence was insufficient to support the three convictions. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010) (internal quotation marks omitted). *See People v. Unger*, 278 Mich. App. 210, 223; 749 N.W.2d 272 (2008) (circumstantial evidence and reasonable inferences arising therefrom may constitute satisfactory proof of first degree murder, including the identity of the killer).

In this case, the Michigan Court of Appeals identified the correct legal standard, *i.e.*, "we consider the evidence presented by the prosecution up to the time the motion is made . . . view that evidence in a light most favorable to the prosecution . . . and determine whether a rational

trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *1, citing *Hampton*, 407 Mich. at 368 (internal quotation marks omitted).  *See Jackson*, 443 U.S. at 319; *Winship*, 397 U.S. at 364.   However, the appellate court failed to apply that standard because it did not explain how the evidence proved the "essential elements" of the three crimes "beyond a reasonable doubt."  Rather, than applying the evidence to each element of the crimes, the appellate court reviewed some of the evidence, and then affirmed all three convictions stating that "a rational trier of fact could find beyond a reasonable doubt that defendant broke into Joyce Johnson's home and killed her to prevent her from testifying at his larceny trial." *Levack*, 2014 WL 2118088 at *5.

As discussed, the Michigan Court of Appeals based this conclusion on its summary of the evidence that: Levack had a motive to murder the victim to keep her from testifying against him in the larceny case; that shortly before the murder, Levack violated a court order and went on property near defendant's home (which supports a legitimate inference that he conducted surveillance on the victim or her house); that a Powerade bottle with Levack's's DNA found 65 to 75 feet from the victim's house disproved Levack's claim that he was never in this area and established that he was near the crime scene; that the placement of the Powerade bottle "on top of leaves and its lack of discoloration suggested that it was placed there around the time of the murder"; that Levack's Tracphone records indicate his movement in and around Crystal Falls on the alleged day that the victim's murder occurred; and that "his evasion of the police, statements to Rose, and the $1,000 on his person suggest that defendant intended to flee, which could indicate his guilt."  *See discussion*, *supra*, § III.A.3.

While the Michigan Court of Appeals drew a number of inferences with respect to Levack's conduct, it did not explain how that evidence established the "essential elements" of the

16

charged crimes beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319; *Winship*, 397 U.S. at 364.  Specifically, there is no evidence: that Levack was in the victim's house; that Levack unlawfully (or even lawfully) entered the house; that Levack intimidated the victim; or that Levack manually strangled the victim.  "Although circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008).  In the Court's opinion, this is one of those times.  While the evidence recited by the Michigan Court of Appeals could lead to the "reasonable speculation" that Levack could have committed witness intimidation, first-degree home invasion, or first-degree murder it does not prove "beyond a reasonable doubt . . . every fact necessary to constitute the crime with which [Levack] is charged." *Winship*, 397 U.S. at 364.

### c.    The Michigan Court of Appeals unreasonably applied *Jackson*

Because the state appellate court rejected Levack's claims on the merits, this Court should accord deference to that decision pursuant to 28 U.S.C. § 2254(d).  As the Sixth Circuit recently stated in *Thompson v. Skipper*, 981 F.3d 476 (6th Cir. 2020):

> Because the Michigan Court of Appeals rejected [the habeas petitioner's] claim on the merits, we accord deference under the Antiterrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254(d).  As relevant here, habeas relief is available only if the Michigan Court of Appeals's [sic] decision "involved an unreasonable application of" *Jackson*'s standard for insufficient-evidence claims. § 2254(d)(1). The state court's application "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Nagy*, 962 F.3d at 199 (quoting *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L.Ed.2d 698 (2014)). In other words, "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Woodall*, 572 U.S. at 427, 134 S.Ct. 1697 (quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)).

> Together, *Jackson* and AEDPA's two layers of deference dictate that "a federal court's 'review of a state-court conviction for sufficiency of the evidence is very limited.' " *Tackett v. Trierweiler*, 956 F.3d 358, 367 (6th Cir. 2020) (quoting *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018)). "First, on direct appeal,

it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*. (quoting *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L.Ed.2d 978 (2012) (per curiam)). "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id*. (quoting *Coleman*, 566 U.S. at 651, 132 S.Ct. 2060).  To prevail, [the habeas petitioner] must overcome both of these layers of deference.

*Thompson*, 981 F.3d at 479.

Here, the Court concludes that Levack has overcome both layers of deference because the Michigan Court of Appeals unreasonably applied federal law in addressing and rejecting Levack's challenges to the sufficiency of the evidence. "[The] AEDPA requires this court to review the actual grounds on which the state court relied." *Bradshaw*, 974 F.3d at 719, citing *Wilson v. Sellers*,  -- U.S. --, 138 S. Ct. 1188, 1192 (2018).  "Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision.  *Id*. at 1191-92 (internal quotation marks and citations omitted).

This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion. In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.

*Id*. at 1192.

To find that sufficient evidence supports a conviction, the *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020), quoting *Jackson*, 443 U.S. at 324, n. 16.  As discussed, the Michigan Court of Appeals' opinion did not determine that the prosecution

established all of the substantive elements of the criminal offenses beyond a reasonable doubt.  *See*

*Jackson*, 443 U.S. at 319, 324; *Winship*, 397 U.S. at 364; *Smith*, 962 F.3d at 205.  In this regard,

the appellate court did not even list the elements of witness intimidation, first-degree home

invasion, or first-degree murder.  Without identifying the elements of the crimes, and applying the

evidence to those elements, the state appellate court had no basis to conclude that "any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson*, 443 U.S. at 319.

Based on this record, the Court concludes that Levack's habeas petition should be

granted because the state's "adjudication of the claim -- (1) resulted in a decision that . . . involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States[.]  28 U.S.C. § 2254(d)(1). In reaching this determination, the Court is

cognizant of the significance attached to a habeas cases involving a claim of insufficient evidence.

> In *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1
> (1978), the Supreme Court held that "the Double Jeopardy Clause precludes a
> second trial once the reviewing court has found the evidence legally insufficient."
> This is true, the Court later explained, because "an appellate court's reversal for
> insufficiency of the evidence is in effect a determination that the government's case
> against the defendant was so lacking that the trial court should have entered a
> judgment of acquittal, rather than submitting the case to the jury." *Lockhart v.*
> *Nelson*, 488 U.S. 33, 39, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). The rule
> announced in *Burks* applies regardless of whether the conviction being overturned
> by the federal court is a federal conviction or a state conviction addressed on
> collateral review.  *See Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 57
> L.Ed.2d 15 (1978) (applying the holding of *Burks* in a habeas-corpus challenge to
> a state-court conviction). An appellate court's declaration that the evidence was
> constitutionally insufficient to support a conviction, in short, has the same effect as
> a judgment of acquittal for the purposes of the double jeopardy analysis.

*Patterson v. Haskins*, 470 F.3d 645, 651-52 (6th Cir. 2006).

Here, the rule announced in *Burks* does not apply.  This Court has not made an

independent evaluation of all of the evidence presented at Levack's trial.  Nor has it concluded

that there was insufficient evidence to support Levack's convictions. Rather, this Court concludes that the Michigan Court of Appeals unreasonably applied clearly established federal law when it found that sufficient evidence supported Levack's convictions without addressing whether the prosecution established each of the "essential elements" of the crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Winship*, 397 U.S. at 364. To remedy this situation, the undersigned recommends that Levack's petition be granted unless the Michigan Court of Appeals allows him to file a new appeal on the issue of sufficiency of the evidence and appoints him appellate counsel to pursue that appeal.

> **B.    Issue II - A new trial should be ordered because misconduct by the jury violated the petitioner's right to be present at trial, his right to confront the witnesses against him, his right to present a defense, and his due process rights.**

While Levack's statement of the issue is expansive, the gist of his claim is that the jurors engaged in misconduct for using Google Maps to view the crime scene:

> The jury sent a note to the judge, the note states the jury had been estimating distances and one of the jurors mentioned there was a shortcut which could be taken to the crime scene. The jurors discussed the fact that they could get a better estimate from Google Maps. The foreman asked one of the jurors to get info from Google Maps and the results showed the shortcut was indeed shorter. One juror objected to the use of Google Maps and so the note asked if it was a concern. It is clear that this is a violation[] of a number of the Petitioner's rights.

Petition at PageID.11.

The Michigan Court of Appeals addressed the juror's use of Google Maps as follows:

> The only constitutional issue on which defendant preserved his appeal is the right of confrontation. Preserved constitutional issues are reviewed de novo; unpreserved constitutional claims are reviewed for plain error affecting the defendant's substantial rights. *People v. Shafier*, 483 Mich. 205, 219–220; 768 NW2d 305 (2009).

> "[A]s a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the

witnesses against him, and the right to a jury that considers only the evidence presented at trial." *Doan v. Brigano*, 237 F3d 722, 733 n 7 (CA 6, 2001) (citations omitted), overruled on other grounds by *Wiggins v. Smith*, 539 U.S. 510; 123 S Ct 2527; 156 L.Ed.2d 471 (2003). Accordingly, a jury that considers "extraneous facts not introduced in evidence" might violate defendant's 6th Amendment right to confrontation. *People v. Budzyn*, 456 Mich. 77, 88; 566 NW2d 229 (1997). To show that "extrinsic influence was an error requiring reversal," defendant must demonstrate: (1) "the jury was exposed to extraneous influences"6; and (2) those "extraneous influences created a real and substantial possibility that they could have affected the jury's verdict." *Id*. at 88-89. To show such a possibility, defendant generally needs to demonstrate that "the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *Id*. at 89.

Here, defendant asserts that the trial court erred when it refused to grant him a mistrial, because his 6th Amendment rights were supposedly violated when a juror used Google Maps during deliberations to confirm the existence of a shortcut to the victim's home.

However, there is no "real and substantial possibility" that exposure to this alleged extraneous influence affected the jury's verdict. The trial court discovered this issue during the proceedings, and was informed that the jurors were not using the Google Maps information. Nonetheless, the court advised the jury that the use of Google was contrary to its instructions and that the jury was not to use the Google information in any way. The court also reinstructed the jury not to conduct original research and investigations, and then allowed the jury to resume deliberations. "Jurors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v. Petri*, 279 Mich. App 407, 414; 760 NW2d 882 (2008).

Because the jury expressly noted its non-consideration of the Google Maps information and the trial court gave a timely instruction to disregard this extrinsic evidence, defendant fails to demonstrate that there was a "real and substantial possibility" extrinsic evidence affected the jury's verdict. Accordingly, the trial court properly denied defendant's motion for mistrial.

*Levack*, 2014 WL 2118088 at *5-6 (footnotes omitted). The court also included a footnote stating,

Moreover, to the extent any violation of defendant's 6th Amendment rights occurred, the jury's express disregard of the Google material and the court's instruction that they disregard this extraneous evidence establishes that the Google information was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24; 87 S Ct 824; 17 L.Ed.2d 705 (1967)."

*Id*. at fn. 8.

The court faced a similar question of juror misconduct involving the use of the Google search engine in *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011). In affirming the trial court's denial of the defendant's motions for a new trial, the Second Circuit reviewed the applicable legal standard:

> While the law presumes prejudice from a jury's exposure to extra-record evidence, *see Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002), that presumption may be rebutted by a "showing that the extra-record information was harmless," *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir.1994); *see United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not."). The necessary inquiry is "objective," *Bibbins v. Dalsheim*, 21 F.3d at 17 (internal quotation marks omitted), and focuses on two factors: (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury, *see United States v. Schwarz*, 283 F.3d at 99.

*Farhane*, 634 F.3d at 168-69.  This harmless error standard applies in reviewing habeas claims raising a Sixth Amendment claim that a jury deliberation included extrinsic evidence, *e.g.*, an out-of-court investigation or experiment.  In such cases, "[t]he habeas petitioner must show that the trial error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Mason v. Mitchell*, 320 F.3d 604, 638 (6th Cir. 2003).

Here, the Michigan Court of Appeals used the appropriate legal standard when it concluded that the jury's actions were harmless error.  The Michigan Court of Appeals' decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).  Accordingly, Levack is not entitled to relief on this claim.

### C.    Issue III - The trial court denied the petitioner a fair trial and his due process rights by denying the petitioner's motions for a mistrial and by erroneous evidentiary rulings.

22

Levack contends that the trial court denied him a fair trial and due process because (1) the jurors consulted Google Maps during deliberations, and (2) "[t]he prosecutor brought out the fact that polygraphs had been offer[ed] to two other prime suspects."  Petition at PageID.13. The Court addressed Levack's claim with respect to Google Maps in § III.B., *supra*.  The only claim that remains is the alleged error related to the use of the polygraph tests.

On appeal, Levack argued that: "(1) the prosecution violated his right to a fair trial by making reference to polygraph examinations; and (2) the trial court abused its discretion when it failed to grant a mistrial on this basis."  *Levack*, 2014 WL 2118088 at *6.  In its decision, the Michigan Court of Appeals cited *People v. Nash*, 244 Mich. App 93, 97; 625 NW2d 87 (2000), for the proposition that "[R]eference to taking or passing a polygraph test is error."  *Id*.  However, under the facts of this case, the appellate court found that the trial court properly denied Levack's motion for a mistrial, and that his due process rights were not violated.  *Id*. at *6-7.

Reference to a polygraph test does not raise a federal constitutional violation on habeas review.  "The Supreme Court has never held that statements implying the results of a polygraph or similar test render the defendant's trial fundamentally unfair, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments." *Maldonado v. Wilson*, 416 F.3d 470, 477 (6th Cir. 2005).  A habeas petitioner's claim based on a reference to a polygraph test "is based on alleged violations of and errors of state law regarding the admission of evidence" and "not cognizable in a federal habeas corpus proceeding."  *Strandberg v. Palmer*, No. 17-1806, 2018 WL 333867 at *2 (6th Cir. Jan. 9, 2018), citing *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) and *Estelle*

*v. McGuire*, 502 U.S. 62, 67-68 (1991).  Accordingly, Levack's claim is not cognizable on federal

habeas review and should be denied.[6]

> **D.      Issue IV – The prosecutor's actions denied the petitioner a fair trial and his due process rights under the Michigan and Federal constitutions.**

Levack contends that the prosecutor denied him a fair trial and violated his due

process rights because she "deliberately brought out irrelevant and highly prejudicial information"

citing MRE 401, 402, and 403.  Petition at PageID.16.  In this regard, Levack states that "[t]he

prosecutor was told by the court not to bring up victim's fear of Petitioner or hearsay about the

incident."  *Id*.  Levack also states that the prosecutor violated MRE 403 by making "comments

and arguments about the Petitioner."  *Id*.

The Michigan Court of Appeals summarily rejected Levack's claims of

prosecutorial misconduct as follows:

> Defendant argues that several instances of prosecutorial misconduct violated his right to due process, despite the fact that he never objected to the prosecutor's conduct at trial. To preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction. *People v. Bennett*, 290 Mich. App 465, 475; 802 NW2d 627 (2010). Defendant also suggests that his attorney's non-objection constituted ineffective assistance of counsel, which, again, is a claim he failed to raise below.

> Absent a contemporaneous objection and request for a curative instruction, appellate review of claims of prosecutorial misconduct is limited to ascertaining whether there was plain error that affected substantial rights.  *People v. Brown*, 279 Mich. App 116, 134; 755 NW2d 664 (2008).  Reversal is warranted only when plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *Unger*, 278 Mich. App at 235. Review is foreclosed unless the prejudicial effect of the remark was so great that it could not have been cured by an appropriate instruction. *People v. Duncan*, 402 Mich. 1, 15-16; 260 NW2d 58 (1977); *People v. Williams*, 265 Mich. App 68, 70-71; 692 NW2d 722 (2005). To the extent that a claim of prosecutorial misconduct is a constitutional issue, it is reviewed de novo, but a trial court's factual findings are reviewed for clear error.  *Brown*, 279 Mich. App at 134.

---

[6] The Michigan Court of Appeals addressed two other issues raised in appellate counsel's brief, "Comments on witness credibility" and "Cell tower evidence."  *See Levack*, 2014 WL 2118088 at *7.  While these issues were part of the state appeal, Levack did not list these claims in his habeas petition.  *See* Petition at PageID.13.

Regarding the ineffective assistance claim, review is precluded "unless the appellate record contains sufficient detail to support the defendant's claim." *People v. Sabin (On Second Remand)*, 242 Mich. App 656, 658-659; 620 NW2d 19 (2000). If it does, the Court must determine whether counsel's performance fell below an objective standard of reasonableness and if so, whether a different result would have been reasonably probable. *People v. Armstrong*, 490 Mich. 281, 289-290; 806 NW2d 676 (2011); *Strickland v. Washington*, 466 U.S. 668, 687-688, 694-696; 104 S Ct 2052; 80 L.Ed.2d 674 (1984).

While defendant's argument of prosecutorial misconduct is based on 15 separate instances, his claims are united by their frivolity and total lack of legal support for the assertion that they constitute misconduct. Because he is unable to demonstrate that the prosecutor committed misconduct in the incidents of which he complains, defendant does not show that his due process rights were violated, or that his attorney was ineffective for not objecting to prosecutorial misconduct that was not objectionable.

*Levack*, 2014 WL 2118088 at *8-9.

The scope of habeas review regarding allegations of prosecutorial misconduct is narrow. This court does "not possess supervisory powers over state court trials." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1355 (6th Cir.1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) ("'[T]he appropriate standard of review for . . . a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.'") (quoting *Darden*, 477 U.S. at 181). To be grounds for habeas corpus relief,

25

the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

Levack's petition does not address the specific acts of alleged prosecutorial misconduct other than to outline a category of alleged misconduct arising from bringing out "irrelevant and highly prejudicial information" citing MRE 401, 402, and 403.[7]  His memorandum sets out a list of the alleged prosecutorial misconduct referenced in his petition.  Specifically, Levack claims that the prosecutor engaged in misconduct, because she presented at least 19 different types of irrelevant, immaterial and prejudicial testimony at trial, which this Court has summarized as follows:

1.    The prosecutor asked petitioner "if he would say that someone was lying if that person said that the victim was scared of the Petitioner."

2.    "The prosecutor brought up that the Petitioner told a witness that he 'took care of' somebody's tires and allegedly gave three scenarios indicating criminal activity".

3.    The prosecutor brought up "[t]he Petitioner's reaction in court when he heard the news of the victim's death at the time of the larceny jury trial."

4.    The prosecutor elicited sympathy from the jury when she "brought out testimony that the victim was a wonderful person, very honest, loyal to a fault without enemies."

5.    During opening statement and when taking testimony from officer, the prosecutor "brought out . . . that interviews were conducted by police to eliminate 'person of interest'".

---

[7] Levack's memorandum includes additional arguments and claims of prosecutorial misconduct which were not set forth in his petition, *i.e.*, "The Prosecutor Improperly Used Symp."; "The Prosecutor Expressed a Personal Belief in the Facts of the Case (and/or the Credibility of the Witnesses)"; "The Prosecutor Brought out an Officers [sic] Opinion as well as a Comment on the Credibility of Another Witness"; "The Prosecutor's Improper Action Created Reversible Error, Whether They Are Considered Separately or in Their Sum Total"; and, " 'Harmless Error,' a Rationale View of the Evidence, or a Similar Argument Should Not be Applicable.  *See* Memorandum at PageID.100-106.

6.      The prosecutor mentioned in opening statement and through testimony "that the Petitioner was birdwatching near the victim's house in violation of a restraining order."

7.      The prosecutor "brought out testimony showing that the officer [sic] were afraid the Petitioner was fleeing when he packed a bag and took a taxi and ended up at a motel."

8.       The prosecutor "brought out a statement that the Petitioner apparently wanted to be killed by police ('a suicide by cop' statement)."

9.      The prosecutor "brought in testimony about Deputy Cross' theory about someone being able to get into the house" even though the deputy "admitted he didn't know how the perpetrator got in", and other testimony by Cross related to interviews made during the investigation, "cell phone records he said which corroborated or discounted witnesses' statements" and "the time he spent eliminating persons of interest."

10.     The prosecutor brought out testimony which "included interviews that Cross made during his investigation, cell phone records he said which corroborated or discounted witness statements, the time he spent eliminating persons of interest, etc."

11.     "The prosecutor brought out that Petitioner was taking care of the victim's house when he called in a B & E of the house" which "was a long time prior to the murder".

12.     The prosecutor brought out details of the jewelry theft case through a variety of witnesses which was irrelevant because even if petitioner was guilty of the theft "it still doesn't mean he murdered the victim."

13.     "The prosecutor brought out additional details of the murder investigation, including which witnesses were talked to and why they were talked to which gave hearsay and officer's opinions and conclusions."

27

14.    The prosecutor brought out irrelevant information which "included bringing out details of the Motel 6 incident, including the tip that the Petitioner was carrying a female into the room with a blanket over her head."

15.    The prosecutor brought out testimony that "[t]he Petitioner had a handcuff key taped to his wrist during the Motel 6 incident and that the ride afterwards back to Crystal Falls was 'tense'".

16.    "The prosecutor went on for pages in the transcript regarding testimony as to the methodology of taking latent prints, the reasons for finding them or not finding them, and their comparison, including a power point presentation on comparison."

17.    While petitioner "was eliminated from having made prints on the door between the garage and the house" the prosecutor "brought out the officer's opinion that he could not 'eliminate' the Petitioner from the prints".

18.    The prosecutor asked Melinda Harvala if she was scared of the Petitioner" and the witness responded "she was not scared of him, but scared of what he might do".[8]

19.    "The prosecutor brought out that during a call with Wes Jones, the Petitioner was not at his league pool match" and "that Petitioner told him he was in Crystal Falls at 7:05 p.m., on September 26, 2011".[9]

---

[8] Government witness Melinda Marie Harvala testified that she was an acquaintance of Levack. *See* Trial Trans. IV (April 26, 2012) (ECF No. 9-9, PageID.1785). On re-direct examination, Ms. Harvala testified that she was distraught when the officers interviewed her about the case. When asked why she was distraught, Harvala explained, "Because of the conversation that I had with Dave [Levack] when him and I were alone. There were things that were talked about during that time. I brought up things that were were talking about and I got really scared." *Id*. at PageID.1800. When asked, "Are you scared of Mr. Levack?", Harvala replied "Not – I can't say I'm scared of him. I'm scared of what he may do." *Id*.

[9] Government witness Wesley William ("Wes") Jones testified that he knew Levack because they had been teammates in pool league for about three years. *See* Trial Trans. IV (ECF No. 9-9, PageID.1866-1867). Jones knew that Levack "was being accused of stolen [sic] jewelry but he didn't do it." *Id*. at PageID.1868. When asked about Levack's "attitude" about the larceny case, Jones testified that "He didn't really seem different or whatever. Just pissed about it cuz he thought he was innocent." *Id*. Jones remembered the events of September 26, 2011, because Levack did not show up for the pool league which was in Iron Mountain that night. *Id*. at PageID.1868-1869. Jones was irritated and

*See* Memo at PageID.92-100.

Having reviewed the relevant portions of Levack's trial, the Court agrees with the Michigan Court of Appeals' observation that Levack's claims "are united by their frivolity and total lack of legal support for the assertion that they constitute misconduct." *Levack*, 2014 WL 2118088 at *9. Because there were no eye-witnesses to the victim's death, the government's case against Levack was based on circumstantial evidence. This required the prosecutor to establish a comprehensive set of facts from which the jury could infer Levack's guilt.

Levack did not challenge the prosecution's witness testimony during trial. Now, he is essentially mounting a collateral attack on that testimony under the guise of a prosecutorial misconduct claim. Levack has failed to show that the government's presentation of this evidence – which constituted the bulk of the prosecution's case – "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. "Asking questions that call for answers that may be deemed inadmissible on relevancy grounds does not amount to prosecutorial misconduct that rises to the level of a due-process violation." *Simmons v. Woods*, No. 16-2546, 2018 WL 618476 at *3 (6th Cir. Jan. 30, 2018), citing *Wade v. Wright*, 120 Fed. Appx. 591, 594 (6th Cir. 2005). In addition, Levack has failed to show that "by allowing this testimony into evidence, the trial court violated some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id*. citing *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted). Accordingly, Levack is not entitled to relief on his claims of prosecutorial misconduct.

---

tried to contact Levack. *Id*. at PageID.1869. He called twice and reached Levack the second time at about 7:05 p.m. *Id*. Jones asked Levack where he was and Levack said something like "Oh my God, I forgot all about it." *Id*. Levack said he was in the Crystal Falls area, *i.e.*, "He was dropping off – he – he was doing some stuff for his attorney. Paperwork or something like that. I don't quite remember." *Id*. at PageID.1870. Jones told Levack that he was "supposed to be here," that "[t]his is ridiculous", and that "I'm going to have to kick you off the team." *Id*.

E.    **Issue V- The trial judge denied the petitioner a fair trial and his due process rights by denying petitioner's motions.**

1.    **Seizure and identification of automobile**

Levack contends that the trial court violated his Fourth Amendment rights when it permitted evidence to be introduced at trial seized from his vehicle.  Levack's claim is not cognizable on federal habeas review.  In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at trial."  The record reflects that Levack had an opportunity to litigate the seizure of his vehicle and the suppression of the evidence found in the vehicle prior to his trial. *See* Motion Trans. (March 8, 2012) (ECF No. 9-4, PageID.796-821).  Levack cannot seek habeas relief based upon an alleged unconstitutional search and seizure.  *See Stone*, 428 U.S. at 494.  Accordingly, this claim of error should be denied.

2.    **Motion to suppress Levack's statements**

Levack claims that the trial judge erred in denying the motion to suppress his statements.  Petition at PageID.22.  The Michigan Court of Appeals addressed the issue as follows:

> Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his 5th Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 444; 86 S Ct 1602; 16 L.Ed.2d 694 (1966); and *People v. Daoud*, 462 Mich. 621, 633; 614 NW2d 152 (2000).  "[W]hether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion." *Daoud*, 462 Mich. at 635. "[D]etermining whether a suspect's waiver was knowing and intelligent requires an inquiry into the suspect's level of understanding, irrespective of police behavior. . . . [T]o establish a valid waiver, the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him." *Id*. at 636–637 (citations omitted).

Here, defendant says that his medical and mental status on October 3, 2011
precluded a knowing and voluntary waiver of his 5th Amendment rights.
Specifically, he claims his diabetes may not have been under control and that he
was mentally ill. The record, however, belies these assertions – the evidence
showed that defendant's blood sugar was normal (indeed, defendant confirmed
during the police interview that it was at an acceptable level). Moreover, his mental
status did not appear to be impaired in a way that would have precluded a knowing
and intelligent waiver. When read in its entirety, the certificate issued by the
hospital after defendant's mental evaluation stated that defendant was depressed
and needed treatment – not that defendant suffered from any condition or illness
that would have had a significant effect on his ability to make a rational decision
about waiver. Further, the audio recording of the police interview indicates that
defendant was stable and that he was more than capable of making a knowing and
intelligent waiver; this was evidenced in part by the fact that he withdrew the waiver
during the interview, and then changed his mind and began talking once again.
Accordingly, the trial court properly denied defendant's motion to suppress his
statements.

*Levack*, 2014 WL 2118088 at *9-10.

The Michigan Court of Appeals applied the appropriate legal standard to Levack's

Fifth Amendment claim.  Levack has not rebutted the facts as set forth by the appellate court.

Based on this record, the Michigan Court of Appeals properly found that Levack waived his

*Miranda* rights with respect to statements, specifically those made on October 3, 2011.  The

Michigan Court of Appeals' decision was neither contrary to, nor an unreasonable application of,

clearly established Federal law as determined by the Supreme Court; nor was the decision based

on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §

2254(d).  Accordingly, Levack is not entitled to relief on this claim.

### 3.    Motion to transfer venue

Levack claims that the trial court violated his constitutional rights when it denied

his motion to change venue.  In addressing this motion, the trial judge observed that:

We're going to have some publicity, but the fact that there probably are not going
to be very many people who know about it in detail that would put them in a
position to be prejudiced.  And we would certainly summon a large number of

jurors so that we can find a jury, and I believe we can do that.  However, if we
don't, we'll have to change venue.  And that's what I think needs to be done.

Motion Trans. (March 8, 2012) (ECF No. 9-4, PageID.788-789).  Ultimately, a jury was seated.

The Michigan Court of Appeals rejected Levack's claim as follows:

Generally, a defendant is to be tried in the county where the crime was
committed. *People v. Houthoofd*, 487 Mich. 568, 579; 790 NW2d 315 (2010).
However, "[t]he right to jury trial guarantees to the criminally accused a fair trial
by a panel of impartial, 'indifferent' jurors." *Unger*, 278 Mich.App at 254, quoting
*Irvin v. Dowd*, 366 U.S. 717, 722; 81 S Ct 1639; 6 L.Ed.2d 751 (1961).  Thus, the
defendant is entitled to a change of venue when a panel of impartial jurors cannot
be found.  In *People v. Jendrzejewski*, 455 Mich. 495, 500-501; 566 NW2d 530
(1997), which, like the present case, involved a small community, the Court stated:

> Federal precedent has used two approaches to determine whether the
> failure to grant a change of venue is an abuse of discretion.
> Community prejudice amounting to actual bias has been found
> where there was extensive highly inflammatory pretrial publicity
> that saturated the community to such an extent that the entire jury
> pool was tainted, and, much more infrequently, community bias has
> been implied from a high percentage of the venire who admit to a
> disqualifying prejudice.  *United States v. Angiulo*, 897 F.2d 1169,
> 1181-1182 (CA 1, 1990).

*Jendrzejewski* distinguished between "factual publicity" and "invidious or
inflammatory" coverage. *Jendrzejewski*, 455 Mich. at 504.  Further, the Court held
that in evaluating whether a defendant was deprived of a fair trial because of pretrial
publicity, the reviewing court is required to consider the totality of the
circumstances and determine whether the pretrial publicity was so unrelenting and
prejudicial in nature that "the entire community [is] presumed both exposed to the
publicity and prejudiced by it." *Id*. at 501.  "When a juror, although having formed
an opinion from media coverage, swears that he is without prejudice and can try
the case impartially according to the evidence, and the trial court is satisfied that
the juror will do so, the juror is competent to try the case." *People v. Cline*, 276
Mich.App 634, 639; 741 NW2d 563 (2007) (citation omitted).

In this case, defendant says that the trial venue should have been changed
because of pretrial publicity and a tainted jury pool.  Neither claim is convincing.
The voir dire indicated that the media coverage was limited to "highlights" and did
not cover the case in great detail.  Nor did anyone suggest the media coverage was
extensive.  Accordingly, the coverage itself does not appear to be of the kind that
would give rise to a concern about a tainted pool.  And the record contains no
evidence that the jury pool was tainted by the media coverage.  In sum, defendant

cannot show actual bias in the community that was caused or related to pretrial publicity.

In addition, defendant cannot show community bias that could be implied from a high percentage of the venire who admitted to a disqualifying prejudice. Defendant seems to base his argument on the venire's familiarity with the victim, law enforcement witnesses, or the area of the crime. However, most of the venire indicated that they did not know defendant, the lawyers, or any witnesses – or that knowing defendant, the lawyers, or the witnesses would not affect judgment of their testimony, and had not caused them to form an opinion. While there were a number who admitted to a disqualifying prejudice, the voir dire was completed in a day and a jury apparently satisfactory to all was seated. Thus, defendant fails to show community bias that deprived him of a fair trial.

*Levack*, 2014 WL 2118088 at *10-11 (footnotes omitted).

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

A jury is presumed impartial, and the burden rests with the challenger to show otherwise. [*Irvin*, 366 U.S. at 723]. A court must grant a change of venue only when pretrial publicity prejudices a defendant's right to a fair trial by an impartial jury. *Id*. Prejudice caused by pretrial publicity sufficient to require a change in venue can be either presumptive or actual. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).

*Lang v. Gundy*, 399 Fed. Appx. 969, 972 (6th Cir. 2010). "Prejudice from pretrial publicity is rarely presumed," *id*. (internal quotation marks omitted), and "exists only where a conviction was 'obtained in a trial atmosphere that had been utterly corrupted by press coverage'", *id*. quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975). "When pretrial publicity does not rise to a level of presumed prejudice, a defendant is entitled to a change of venue only if the pretrial publicity is shown to have caused actual prejudice." *Lang*, 399 Fed. Appx. at 973.

To discern actual prejudice, trial courts should conduct a "searching voir dire" of prospective jurors, reviewing both the media coverage and jurors' statements to assess "whether a community-wide sentiment exists against the defendant." [*Foley*, 488 F.3d at 387]. Negative media coverage by itself is insufficient to create actual prejudice, and even the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, does not rebut the presumption of impartiality. *Id*. "It is sufficient if the juror can lay aside his impression or opinion

and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639; *Foley*, 488 F.3d at 387.

*Id*.

Laveck has not demonstrated that prejudice should be presumed in this case, *i.e.*, that the trial atmosphere "had been utterly corrupted by press coverage." Nor has he shown actual prejudice. The trial judge and attorneys questioned the potential jurors at length, with jury selection commencing at 9:19 a.m. and ending at 6:16 p.m. Trial Trans. I (April 23, 2012) (ECF No. 9-6, PageID.950-1239). Levack mentioned 14 jurors who knew witnesses, lawyers, employees at the prosecutor's office, or the victims (Leonoff, Spelgatti, Mattson, Groop, Franzene, Surface, Puskala, Wayman, Ross, Paulson, Maki, Tomlinson, Kurchinski, and Osterlund), and one juror (Raker) who Levack claims was from Wisconsin and ineligible to act as a juror.[10] Memorandum at PageID.108-111.

Of these 15 individuals identified by Levack, five acted as jurors, *i.e.*, Raker, Surface, Groop, Ross, and Mattson. *See* Trial Trans. Vol. X (May 4, 2012) (ECF No. 9-15, PageID.2726-2729) (polling of jury). Despite Levack's present claims, he had unused peremptory challenges and could have removed any one of these five jurors at trial. Both Levack's counsel (Mr. Jaspen) and the prosecutor (Ms. Powell) passed on using their remaining challenges. Trial Trans. I at PageID.1237. Given this record, the trial judge had no reason to move the venue to a different county.

The Michigan Court of Appeals' decision was neither contrary to, nor unreasonable application of, clearly established Federal law as determined by the Supreme Court;

---

[10] Levack's claim regarding juror Raker is meritless. During voir dire, Raker testified that he was the retired CEO of a hospital, that he "live[d] up here year round", and that he knew "[a]bsolutely nothing" about Levack's case. Trial Trans. I at PageID.1232.

nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).  Accordingly, Levack is not entitled to relief on this claim.

### 4.    Evidence of prior bad acts

Here, Levack raises a similar claim as in his state appeal, *i.e.*, that the trial court erroneously admitted prior bad-acts evidence of the larceny case, a bond violation, his behavior at the Motel 6, and his methamphetamine use.  *See Levack*, 2014 WL 2118088 at *12.  Levack's claim that the admission of this bad act evidence violates his federal due process rights is without merit.  "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Accordingly, Levack is not entitled to relief on this claim.

### F.    Issue VI - The trial judge erred in failing to dismiss jurors for cause as requested by both the prosecution and defense, resulting in an unfair and biased jury.

Levack claims that the trial court violated his rights because the court refused to dismiss jurors for cause and made Levack use his peremptory challenges to remove jurors.  The Michigan Court of Appeals addressed this claim as follows:

> This Court uses a four-part test "to determine whether an error in refusing a challenge for cause merits reversal." *People v. Lee*, 212 Mich. App 228, 248-249; 537 NW2d 233 (1995).
>
> > There must be a clear and independent showing on the record that (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. [*Id.*]
>
> Defendant asserts that he was forced to use up his peremptory challenges in part to excuse jurors who should have been dismissed for cause, and that the remaining jurors were biased and unfair, violating defendant's 5th Amendment right to due

> process. However, defendant did not exhaust his peremptory challenges. Were we nonetheless to conclude that any of the denials for cause were improper, defendant's failure to exhaust peremptory challenges precludes relief.

*Levack*, 2014 WL 2118088 at *11.

Levack's claim is meritless.  As the appellate court observed, Levack could have used a peremptory challenge to remove any juror.  Levack's failure to exhaust these challenges precludes relief.  Even if Levack had used all of his peremptory challenges, this does not implicate a federal constitutional right.  "[T]he right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial."  *Georgia v. McCollum*, 505 U.S. 42, 57 (1992).  *See Robinson v. Campbell*, No. 15-CV-12808, 2017 WL 2117901 at *3 (E.D. Mich. May 16, 2017) ("The United States Supreme Court has repeatedly held that peremptory challenges are not of a federal constitutional dimension.").  Accordingly, Levack is not entitled to relief on this claim.

The Michigan Court of Appeals' decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).  Accordingly, Levack is not entitled to relief on this claim.

### G.    Issue VII - Trial Court denied Levack the right to assist in his own trial

Levack contends that the trial court denied him the right to assist in his trial.  The Michigan Court of Appeals addressed this claim as follows:

> A defendant is entitled to "a fair opportunity to consult with counsel and prepare his defense." *People v. Henley*, 26 Mich. App 15, 25; 182 NW2d 19 (1970). Here, defendant claims that he was denied the right to assist in his defense because he was not given a laptop computer to review evidence.  He did not move for an adjournment or otherwise indicate that he needed more time to review evidence. Accordingly, this issue is not preserved and review is for plain error affecting a substantial right. *Carines*, 460 Mich. at 763-764.

Defendant fails to show that access to a laptop computer is part of his entitlement to a "fair opportunity to consult with counsel and prepare his defense." Nor has he shown that his counsel's ability to prepare a witness and exhibit list was in any way hampered by defendant's lack of access to a laptop computer before March 9, 2011 [sic]. Defendant indicates that he had only 10 days after this date to submit the witness and exhibit list, yet the register of actions indicates that it was filed five days later on March 13, 2012. It therefore does not appear that the laptop was necessary for this purpose, or that he was denied a fair opportunity to prepare for his defense.

*Levack*, 2014 WL 2118088 at *13.[11]

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right  .  .  .  to have the Assistance of Counsel.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The right to assistance of counsel includes the right to consult with counsel and to prepare a defense. *See Avery v. State of Alabama*, 308 U.S. 444, 446 (1940) ("the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel"). In his memorandum, Levack states that on December 13, 2011, his defense attorney requested that he be given a laptop computer to review evidence on 36 DVDs and that the trial judge took the matter under advisement. Assuming that Levack was provided with a laptop on March 3, 2012, he had it for several weeks before his trial commenced on April 23, 2012. *See* Trial Trans. I (ECF No. 9-6). Levack provides no basis to support his claim that the trial court denied him the right to assist counsel at trial. Levack simply states that he had the laptop 10 days before "the cut off [date] to the offer of evidence for trial" and 40 days before the start of his trial. Accordingly, Levack is not entitled to relief on this claim.

---

[11] In its decision, the Michigan Court of Appeals' reference to March 9, 2011, is obviously an error, being a date which was six months before the victim died. In his supporting memorandum, Levack states that he received the laptop on March 3, 2012. Memorandum at PageID.120.

**H.      Issue VIII - Petitioner received such ineffective assistance of counsel that it rises to the level of needing a new trial.**

**1.      The state appellate court decision**

Levack contends that his trial counsel was ineffective.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test to determine whether counsel's assistance was so defective as to require reversal of a conviction.  First, the defendant must show that counsel's performance was deficient.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  "In this regard, the court will 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.  1994) (quoting *Strickland*, 466 U.S. at 689).

Second, the defendant must show that counsel's deficient performance prejudiced the defense, *i.e.*, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.  "[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 693.  "Even if a [petitioner] shows that particular errors of counsel were unreasonable, therefore, the [petitioner] must show they actually had an adverse effect on the defense." *Id*.  The appropriate test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.  at 694.  In making this determination, the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

In rejecting Levack's claim, the Michigan Court of Appeals applied the appropriate standard, but did not address his claims with any specificity, stating:

> Here, defendant's argument that he did not receive effective assistance of counsel is simply a list of grievances against his attorney, and in every instance he either fails to establish a factual predicate for his claim, or does not show that his cause would have been advanced had his attorney acted as defendant claims his attorney should have. He also fails to demonstrate that any of the actions or inactions identified would have had any effect on the outcome of his trial. Accordingly, he has failed to establish ineffective assistance of counsel.

*Levack*, 2014 WL 2118088 at *13.

### 2.    Levack's habeas claims

Under *Strickland*, the reviewing court's scrutiny of counsel's performance is highly deferential, and the court is to presume that counsel rendered adequate assistance and made decisions with reasonable professional judgment.  Strickland, 466 U.S. at 689-690.  "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential', and when the two apply in tandem, review is 'doubly' so[.]" *Harrington*, 562 U.S. at 105 (internal citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

Levack's petition sets out the following claims of ineffective assistance of counsel:

> Defense counsel did not hire or consult with expert witnesses for defense. Petitioner filed a motion for county funds for experts and other trial expense [sic] on December 15. 2011.  On January 6, 2012 the court approved funds for expert witnesses and trial expenses, to include an investigator, pathologist DNA/Fingerprint/Footprint and Cell Phone.  However, counsel failed to contract with or to use the funds for these experts on behalf of the Petitioner.  Defense Counsel further failed to question or introduce expert testimony concerning Joyce Johnson's medical conditions and the car accident she had that resulted in several injuries that could have resulted in her ultimate death.

Petition at PageID.25.[12]

Levack presents no authority to support his conclusory claim that his counsel was ineffective for failing to obtain an expert witnesses or investigators related to DNA evidence, fingerprint evidence, or his cell phone records. "Counsel has a duty to make reasonable

---

[12] The Court notes that Levack raised other claims of ineffective assistance in his supporting memorandum.  As discussed, the issues before the Court are those set out in the petition, not individual arguments set out in the 90-page memorandum.  *See* Memorandum (ECF No. 2, PageID.121-123).

investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The Court recognizes that "attorneys can always do more in preparation for a trial." *See Mason v. Mitchell*, 320 F.3d 604, 618 (6th Cir. 2003).  However, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  In short, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Here, the Court will apply "a heavy measure of deference" to counsel's decisions not to hire expert witnesses or investigators.  As discussed, the government had no evidence that Levack was in the victim's house prior to her death.  Given this admitted lack of evidence, Levack's counsel could reasonably conclude that it was not necessary to engage experts regarding DNA, fingerprints, or footprints.  Next, Levack provides no basis for hiring an expert related to the cell phone records.  Next, with respect to the cause of death, the pathologist determined that the victim's cause of death was manual strangulation and the manner of death was homicide.  Trial Trans. V (April 27, 2012) (ECF No. 9-10, PageID.1956). Levack presents no basis for defense counsel to hire an expert to dispute this report, or to support Levack's unfounded claim that the victim actually died from injuries sustained in a previous car accident. Finally, Levack has not demonstrated prejudice.  He has presented no evidence to explain how hiring experts or investigators would have been helpful to his defense.  Accordingly, this claim should be denied.

## IV.    Recommendation

For these reasons, I respectfully recommend that Levack's habeas petition be **GRANTED** and that Levack's convictions be **VACATED**, **unless** the Michigan Court of Appeals grants Levack a new appeal limited to the issue of sufficiency of the evidence and appoints Levack appellate counsel to file that appeal.  Rule 8, Rules Governing § 2254 Cases in the United States District Courts.


Dated:  January 22, 2021                                    /s/ Ray Kent
                                                            RAY KENT
                                                            United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).